Affirmed in Part, as Reformed, Reversed and Rendered in Part, and
Opinion filed April 29, 2008








Affirmed in Part, as Reformed, Reversed and Rendered
in Part, and Opinion filed
April 29, 2008.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-06-00581-CV

____________

 

SEAN LUNDY, Appellant

 

V.

 

MARCOS V. MASSON,
M.D. and GLOBAL ORTHOPAEDICS, INC., Appellees

 



 

On Appeal from the 269th
District Court

Harris County, Texas

Trial Court Cause No. 2003-45146

 



 

O P I N I O N

In
twenty-three issues, appellant Sean Lundy appeals the jury verdict rendered in
favor of appellees Marcos Masson, M.D. and Global Orthopaedic Solutions, Inc. (AGlobal@) on their claims
of fraud and breach of fiduciary duty.  We reform the judgment in favor of
Masson to reflect an election of remedies, and we affirm as reformed.  We
affirm the judgment in favor of Global on its breach of fiduciary duty claim. 
We reverse and render that portion of the judgment in favor of Global on its
fraud claim.








I. FACTUAL AND PROCEDURAL BACKGROUND

In
July 2001, Marcos Masson, M.D., an orthopaedic upper extremity surgeon, formed
Global to design and produce orthopaedic surgical devices.  In November 2001,
three new members joined GlobalCMark Henry, M.D., a partner at Masson=s orthopaedic
surgical practice, Houston Hand and Upper Extremity Center, L.L.C. (AHouston Hand@), Sean
Griggs, M.D., a former partner at Houston Hand, and Sean Lundy.[1]

Henry
first introduced Masson to Lundy in the summer of 2000.  At that time, Masson
owned MasTech, a surgical device company.  Lundy and Henry, who had a close and
longstanding friendship dating back to college, were partners, along with Donny
Byrne, in a company called Orthopaedic Retractors, Inc. (AORI@).  In 1999, Byrne
had executed an agreement with Lundy and Henry in which he had assigned his
retractor patent and related technology to ORI in exchange for a one-third
ownership interest in the company.

The
purpose of the meeting between Lundy and Masson in the summer of 2000 was to
explore a possible merger between MasTech and ORI.  Following the meetings,
Lundy disappeared for approximately one year, ostensibly due to personal
problems.[2] 
Shortly after Masson formed Global in July 2001, at Henry=s urging, he
interviewed Lundy to be President of Global.  In the course of their
discussions, Masson asked Lundy about the status of the patent that Byrne had
assigned to ORI.  Lundy told him, ANo problem.  There
was a two-year contract that we had, or I did with Byrne, because Mr. Byrne
apparently owed B owned the patent for retractors . . .
[a]nd now that the two-year contract is up, we can do whatever we want with
it.  It=s not a problem.@








In
December 2001, Lundy began his employment as President of Global.[3] 
His compensation included an annual salary of $200,000 and a 20% ownership
interest in Global.  In addition, Masson agreed to loan $75,000 to Lundy,
payable to Global, to assist him in moving from Virginia and buying a new home
in Houston.  Masson testified that Lundy was responsible for managing the
company which included, among other duties, hiring employees, preparing a
business plan, negotiating vendor and distributor contracts, identifying
manufacturers for the company=s products, researching industry standards
for pricing and packaging issues, learning about the sterilization process, and
maintaining the financial books and records.

In
December 2001, Masson also loaned Global $450,000 as start-up cash and signed a
promissory note payable to Bank of America for a revolving line of credit in
the amount of $1,000,000.  Houston Hand also made numerous cash loans to Global
totaling more than $670,000.  Over the next two years until Global ceased its
operations, the company=s sales fluctuated greatly.  According to
Masson, Lundy told him that Global=s sales were
between $50,000 to $100,000 per month and, based on Lundy=s assurances,
Masson believed that Athings were going great.@  However, Masson
became concerned about Global=s financial condition when some of the
company=s officers called
him to complain about Lundy=s absence from the company and he learned
that several employees had been fired.  When Masson requested financial
information from Lundy, Lundy refused to provide it to him.  Dawn Burks, Global=s Vice President
of Operations, testified that when she attempted to provide Masson with
financial information at his request, Lundy became angry and forbade her from
providing any financial reports to Masson without first securing his approval.








In
October 2002, Cindy Reichek, Global and Houston Hand=s controller,
resigned because of differences with Lundy and Henry.  Lundy told Masson that
Cindy had made Aa mess@ of the
bookkeeping and proposed working at Houston Hand for three to four weeks to Aclean the books,@ to which Masson
agreed.  When Masson later became concerned about Lundy=s extended absence
from Global, Henry reassured him that they needed Lundy=s help at Houston
Hand and that Lundy would return to Global.  Lundy worked at Houston Hand for
approximately ten months and, according to Masson, never returned to Global=s offices.  Masson
later learned that Lundy and Henry had executed an employment agreementCwithout Masson=s knowledgeCunder which Lundy
was to begin working full-time for Houston Hand as its General Business Manager
beginning in May 2003.[4]

In May
2003, Global was converted from an L.L.C. to a corporation.  At trial, Masson
testified that he agreed to the conversion based on Lundy=s representation
that it was for tax purposes.  As shareholders of the corporation, Masson and
Henry each owned 39.5% of Global and Lundy owned 20%.  Lundy was named
President and Chief Operating Officer, Masson was named Chairman of the Board,
and Henry was named Chief Science Officer.

In
June 2003, in an effort to raise $3,000,000 to further Global=s business
development, Lundy prepared a private placement memorandum to present to
outside investors.  Lundy told Masson that the additional money would enable
them to Agrow the company@ and to repay the
$450,000 loan to Masson.  Ultimately, no one invested in Global as a result of
the memorandum.








In
July 2003, Masson received the first financial report regarding Global from the
company=s accountant,
Lamont Grogan.  The profit and loss statement showed that Global had lost more
than $570,000 in 2002.  The balance sheet revealed, among other things, a
negative balance of $592,313.99, and that the entire $1,000,000 line of credit
extended to Global by Bank of America had been drawn down.[5] 
In addition, the balance sheet did not reflect the loans from Houston Hand to
Global.

On
August 13, 2003, Masson filed suit against Lundy alleging fraud, conversion,
and breach of fiduciary duty and requested that the court appoint a receiver
for Global.[6] 
On December 12, 2003, the trial court appointed Charles Gerhardt as receiver
for Global.  Based on his findings, Gerhardt filed cross-claims on behalf of
Global against Lundy alleging fraud and breach of fiduciary duty.[7] 
In December 2005, a jury trial was held which lasted five days.








At
trial, Gerhardt testified about his assessment of Global=s financial
condition.  In an effort to determine whether the business could be operated,
he interviewed numerous people, including Lundy, Masson, and Byrne, reviewed
Global=s books and
financial records, and inspected Global=s facilities and
existing inventory.  Gerhardt discovered that Global had no remaining employees
and no money in its bank accounts, the existing inventory was not capable of
being sold, there was no insurance in place, and the accounts receivable were
uncollectible.  Based upon all of the information available to him, Gerhardt
determined that Global could not be run.  He also concluded that Global=s problems were
the result of Lundy=s malfeasance, and not simply bad business
judgment.  Gerhardt testified that he decided to sue Lundy on behalf of Global
because of (1) Lundy=s failure to properly document the $75,000
promissory note in Global=s financial books reflecting the loan made
to him by Global and his subsequent denial in his deposition that he had ever
seen or signed the note, (2) Byrne=s lawsuit,[8]
(3) the inaccurate financial information reflected in Global=s accounting software,
and (4) the Agrossly misleading@ financial
projections in the private placement memorandum prepared by Lundy.

At the
conclusion of trial, the jury rendered a verdict in favor of Masson on his
claims of fraud and breach of fiduciary duty, awarding him $985,000 in actual
damages and $500,000 in punitive damages.  The jury also found in favor of
Global on its fraud and breach of fiduciary duty claims, awarding the company
$150,000 in actual damages and $175,000 in punitive damages.[9] 
Lundy filed a motion for new trial, which the trial court subsequently denied. 
Lundy timely filed this appeal.[10]

II. STANDARD OF REVIEW

A.      Legal Sufficiency

          When a party challenges the legal sufficiency
of the evidence supporting an adverse finding on an issue on which it does not
have the burden of proof, that party must demonstrate on appeal that there is
no evidence to support the adverse finding.  Ikon Office Solutions, Inc. v.
Eifert, 125 S.W.3d 113, 123 (Tex. App.CHouston
[14th Dist.] 2003, pet. denied); Price Pfister, Inc. v. Moore & Kimmey,
Inc., 48 S.W.3d 341, 347 (Tex. App.CHouston [14th Dist.]
2001, pet. denied) (citing Croucher v. Croucher, 660 S.W.2d 55, 58
(Tex.1983)).  To prevail on a legal sufficiency challenge to a question on
which it had the burden of proof, a party must establish that (1) there was no
evidence to support the jury=s finding and (2) the
evidence established a contrary proposition as a matter of law.  Ikon Office
Solutions, 125 S.W.3d at 123; Schwartz v. Pinnacle Commc=ns, 944
S.W.2d 427, 431B32 (Tex. App.CHouston [14th Dist.]
1997, no writ).








We consider all of the evidence in the light most favorable
to the jury=s verdict, indulging every reasonable inference in favor of
the prevailing party.  Price Pfister, Inc. v. Moore & Kimmey, Inc.,
48 S.W.3d 341, 347 (Tex. App.CHouston [14th Dist.]
2001, pet. denied) (citing Associated Indem. Corp. v. CAT Contracting, Inc.,
964 S.W.2d 276, 285B86 (Tex. 1998)).  We
will sustain a legal insufficiency point when (a) there is a complete absence
of evidence of a vital fact, (b) the court is barred by rules of law or of
evidence from giving weight to the only evidence offered to prove a vital fact,
(c) the evidence offered to prove a vital fact is no more than a mere
scintilla, or (d) the evidence conclusively establishes the opposite of a vital
fact.  Price Pfister, 48 S.W.3d at 347 (citing Merrell Dow Pharms.,
Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997)).  If the record contains
any evidence of probative force to support the jury=s
finding, we must overrule the legal insufficiency point.  Id. (citing ACS
Investors, Inc. v. McLaughlin, 943 S.W.2d 426, 430 (Tex. 1997)).  The
factfinder is the sole judge of the credibility of the witnesses and the weight
to give their testimony.  See City of Keller v. Wilson, 168 S.W.3d 802, 819 (Tex. 2005).  It is the court=s
charge as it was submitted to the jury that measures the sufficiency of the
evidence when the opposing party fails to object to the charge.  Osterberg
v. Peca, 12 S.W.3d 31, 55 (Tex. 2000).

B.      Factual Sufficiency

When reviewing a challenge to the factual sufficiency of
the evidence, we must examine all of the evidence in the record, both
supporting and contrary to the judgment.  Plas-Tex, Inc. v. U.S. Steel Corp.,
772 S.W.2d 442, 445 (Tex. 1989); Ikon Office Solutions, 125 S.W.3d at
123.  After considering and weighing all of the evidence, we will sustain the
challenge only if the finding is so contrary to the overwhelming weight of the
evidence as to be clearly wrong and unjust.  Cain v. Bain, 709 S.W.2d 175,
176 (Tex. 1986); Marsh v. Marsh, 949 S.W.2d 734, 739 (Tex. App.CHouston
[14th Dist.] 1997, no writ).

                                                    III. 
ANALYSIS

A.      Fraud








To recover on an action for fraud, a party must prove that
(1) a material representation was made, (2) the representation was false, (3)
when the speaker made the representation, he knew it was false or made it
recklessly without knowledge of the truth and as a positive assertion, (4) the
speaker made it with the intention that it should be acted upon by the party,
(5) the party acted in reliance upon it, and (6) the party thereby suffered
injury.  In re FirstMerit Bank, N.A., 52 S.W.3d 749, 758 (Tex.
2001) (orig. proceeding); Formosa Plastics Corp. USA v. Presidio Eng=rs & Contractors, Inc., 960 S.W.2d 41, 47 (Tex. 1998); Solutioneers
Consulting, Ltd. v. Gulf Greyhound Partners, Ltd., 237 S.W.3d 379, 385
(Tex. App.CHouston [14th Dist.] 2007, no pet.).

1.       Masson

a.       Cause of
Action

In issues one and two, Lundy contends the evidence is
legally and factually insufficient to support the jury=s
finding in favor of Masson on the fraud issue.  Specifically, he argues that
the evidence does not demonstrate that he misrepresented the status of Byrne=s
retractor patent or that he failed to disclose certain facts during his job
interview with Masson.

The record reveals that Byrne (who is not a party to this
suit) obtained a patent on a surgical device called a retractor in 1994.  In
1999, he agreed to assign his retractor patent and technology to ORI in
exchange for a one-third ownership interest in ORI.  The assignment provided
that A[i]n the event that ORI has failed to provide marketing and
commercialization services regarding retractor devices, including those
encompassed by the claims of U.S. and foreign patents owned by Byrne, by the
end of a three year period beginning with the Effective Date of this Agreement
[February 11, 1999], Byrne and/or Surgical Innovations L.L.P. have the right to
request that the Retractor Technology be reassigned to Byrne and/or Surgical
Innovations L.L.P.  Upon such an event and the request of Byrne and/or Surgical
Innovations L.L.P., ORI will execute such a re-assignment document.@








At trial, Byrne testified that when he learned from Henry
that ORI no longer had funding to continue its operations, he requested that
ORI reassign the patent to him pursuant to the agreement.  However, despite
Byrne=s efforts to contact them, neither Henry nor Lundy returned
his calls or otherwise communicated with him.  Masson testified that when he
asked Lundy in 2001 about the status of Byrne=s
patent, Lundy told him, ANo problem.  There was
a two-year contract that we had, or I did with Byrne, because Mr. Byrne
apparently owed B owned the patent for retractors . . . [a]nd now that the
two-year contract is up, we can do whatever we want with it.  It=s not
a problem.@  When Byrne contacted a friend who was a sales
representative in the orthopedic industry to discuss marketing his retractor,
he learned that the product was already being manufactured and sold by Global. 
Masson testified that the retractor was Global=s
initial main product.

          Based on our review of the record, we conclude
the evidence is both legally and factually sufficient to support the jury=s
fraud finding.  First, the evidence shows that Lundy made a false, material
misrepresentation to Masson.  When Masson asked Lundy about Byrne=s
retractor, Lundy told him that the patent was Anot a
problem@ and that they could do whatever they wanted to with it. 
However, as the agreement between Byrne and ORI clearly illustrates, this was
not the case.  Upon Byrne=s request and the
expiration of a three-year period, ORI was contractually bound to reassign the
patent to Byrne.  Further, as evidenced by Masson=s
testimony, this representation was material because the retractor became Global=s
initial main product.  See Burleson State Bank v. Plunkett, 27 S.W.3d
605, 613 (Tex. App.CWaco 2000, pet. denied)
(AMaterial means a reasonable person would attach importance
to and would be induced to act on the information in determining his choice of
actions in the transaction in question.@).








Second, the evidence  supports the jury=s
findings that Lundy knew of the falsity of this representation, or at least
made it recklessly without knowledge of the truth, and intended Masson to rely
upon it.  Lundy testified that he was involved in the negotiations of the terms
of the agreement between ORI and Byrne and that he approved the terms.  Byrne
testified that Lundy would not return his call or communicate with him after he
requested that ORI reassign the patent to him.  At the very least, this
evidence creates the inference that Lundy acted recklessly when he told Masson
that Byrne=s patent would not be a problem and that they could do
whatever they wanted to with it and that he intended Masson to rely on it.  See
Spoljaric v. Percival Tours, Inc., 708 S.W.2d 432, 435 (Tex. 1986) (noting
that fraudulent intent is not susceptible to direct proof and must invariably
be proven by circumstantial evidence); Solutioneers Consulting, Ltd.,
237 S.W.3d at 386.

Finally, the evidence supports the jury=s
findings as to Masson=s reliance on Lundy=s
misrepresentation and as to the resulting injury.  Masson relied on Lundy=s
assurance that they could use Byrne=s retractor technology
when he loaned $450,000 in start-up cash to Global and personally guaranteed a
$1,000,000 line of credit.  Masson also relied on Lundy=s
misrepresentation when Global began manufacturing its retractor using Byrne=s
technology and selling its product on the market.  Lundy argues that Masson
knew about Lundy=s dealings with Byrne because Masson had previously met
with Byrne to discuss combining ORI, MasTech, and Byrne=s
company and, therefore, could not have relied upon Lundy=s
representation regarding Byrne=s patent.  See
Wright v. Sydow, 173 S.W.3d 534, 546 (Tex. App.CHouston
[14th Dist.] 2004, pet. denied) (concluding that plaintiff=s
knowledge of alleged misrepresentation precluded reliance on statement as
matter of law).  Even assuming this is true, it is unclear from the record what
precisely Masson allegedly knew about Lundy=s Adealings@ with
Byrne, and it does not demonstrate that Masson knew that Byrne was entitled to
reassignment of the patent.  

As a result of his reliance, Masson suffered damage when
(1) he was sued by Byrne for, among other things, conversion, arising from
Global=s use of Byrne=s patent technology,
and ultimately settled the claims against him, (2) he was sued by Bank of
America based on his personal guarantee of the $1,000,000 line of credit to
Global, on which $200,000 was still outstanding at the time of trial, and (3)
he was not repaid any portion of the $450,000 loan to Global.  See, e.g.,
Playboy Enters., Inc. v. Editorial Caballero, S.A. de C.V., 202 S.W.3d 250,
269B70 (Tex. App.CCorpus Christi 2006,
pet. denied) (finding legally sufficient evidence of out-of-pocket damages
where, appellee, in reliance on appellant=s
fraud, expended funds for business activities).  The jury awarded Masson
out-of-pocket damages in the amount of $400,000 and $100,000 for damage to past
credit.








As such, we find the record contains evidence of probative
force to support the jury=s finding in favor of
Masson on the fraud issue and that such a finding is not so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust.  We
overrule issues one and two.

b.       Broad Form
Submission

In issue five, Lundy contends that the broad form of the
fraud question was defective.  He argues that because Masson asserted two
distinct factual theoriesCi.e., a failure to disclose during the interview process and
an affirmative misrepresentation based on Byrne=s
patentCthe jury should have been required to specify the theory
upon which it based its answer.

Broad form jury charge submissions are mandated by Texas
Rule of Civil Procedure 277 whenever feasible.  Tex. R. Civ. P. 277; Texas Dep=t of Human Servs. v. E.B., 802 S.W.2d 647, 649 (Tex. 1990).  The comments to Texas
Pattern Jury Charge (APJC@)
105.1, which is the question submitted in common law fraud cases, state that a
broad-form question should be appropriate in most cases involving claims for
fraud and should be accompanied by appropriate instructions and definitions as
provided under PJC 105.2B.4.  See Comm.
on Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury Charges:
Business, Consumer, Insurance, Employment PJC 105.1 (2006).  The comments
to PJC 105.2 state that A[i]f more than one
definition is used, each must be separated by the word or, because a
finding of any one type of misrepresentation would support recovery.@ 
Comm. on Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury
Charges: Business, Consumer, Insurance, Employment PJC 105.2 (2006).








The fraud question follows verbatim the suggested language
found in PJC 105.1B.4.  Question No. 1
asks ADid Sean Lundy commit fraud against Marcos Masson?@ and
then provides instructions and definitions, separated by the word Aor,@ for
both intentional misrepresentation (PJC 105.2-.3) and a failure to disclose
(PJC 105.4).  Contrary to Lundy=s assertion, trial
courts may combine several species of fraud into one broad form fraud question
and are not required to ask the jury to specify the grounds for its answers.  See
E.B., 802 S.W.2d at 649 (holding trial court is not required to ask jury to
specify ground on which it relied to answer question in jury charge);
Formosa Plastics Corp., USA v. Presidio Eng=rs & Contractors, Inc., 941 S.W.2d 138, 146 (Tex. App.CCorpus
Christi 1995), rev=d on
other grounds, 960 S.W.2d 41 (Tex.
1998).  Lundy=s fifth issue is overruled.

c.       Jury Question
No. 8

In issue three, Lundy contends that the trial court erred
in handling the jury=s answer to Question
No. 8.  Specifically, he argues that the court should have instructed the jury
of the nature of the problem in writing and sent them back for further
deliberations.  See Tex. R. Civ.
P. 295.[11]

Question
No. 8 asked the jury, AWhat
was the amount of Sean Lundy=s
compensation from Global?@  The
jury answered A~ $260,000.@[12]  When
the jury verdict was returned and read in open court, the following exchange
between the court and the jury took place:

The Court:                       Question
No. 8, you have this little mark.

The Presiding Juror:        Tilde
in the front. 

The Court:                       What
does that B does that mean anything?

The Presiding Juror:        We
tried to say approximately.

The Court:                       Well,
it cannot be approximately.

The Presiding Juror:        Strike
the tilde.  I need to take off the tilde then.

The Court:                       Does
everybody agree with that?

Jurors:                            Yes.

The Court:                       So
there is no tilde in there?

Jurors:                            Right.








The Court:                       Is
that correct?

Jurors:                            Correct.

The Court:                       That=s an affirmative answer
by everyone present.  Mr. Stenson, if you would please indicate that by
initialing that portion right there, please.

The Presiding Juror:        Yes.

The Court:                       Thank
you very much.  All right.  I ask the presiding juror if this is a unanimous
verdict of the jury?

The Presiding Juror:        Yes,
Your Honor, it is.

Lundy
did not object to the jury=s
answer to Question No. 8 or to the manner in which the court dealt with it
before the jury was discharged.  He first raised the issue of how the trial
court handled the jury=s
answer in his motion for new trial.  Texas Rule of Appellate Procedure 33.1(a)
requires a party to present to the trial court a Atimely
request, objection, or motion.@  To
preserve error, an objection to an incomplete or unresponsive verdict, or
conflicting jury findings, must be made before the jury is discharged.  See
Fleet v. Fleet, 711 S.W.2d 1, 3 (Tex. 1986); Greater Houston Transp. Co.
v. Zrubeck, 850 S.W.2d 579, 586 (Tex. App.CCorpus
Christi 1993, writ denied) (noting that errors which must be brought to trial
court=s attention before jury is discharged are those that may be
cured by further deliberation); Roling v. Alamo Group (USA), Inc., 840
S.W.2d 107, 109 (Tex. App.CEastland
1992, writ denied) (concluding trial court must be made aware of alleged error
so it can prevent or correct error).[13]  Issue three is
overruled.








In
issue four, Lundy contends that, assuming we find no error in the trial court=s handling of the jury=s
answer to Question No. 8, the finding should nevertheless be set aside because
it is immaterial.  A question is immaterial when it should not have been
submitted, it calls for a finding beyond the province of the jury, such as a
question of law,  or when it was properly submitted but has been rendered
immaterial by other findings.  Southeastern Pipe Line Co. v. Tichacek,
997 S.W.2d 166, 172 (Tex. 1999); Spencer v. Eagle Star Ins. Co. of Am. 876
S.W.2d 154, 157 (Tex. 1994).  In the charge conference, Lundy=s counsel objected that Question No. 8 should not be
submitted because Ait=s an immaterial finding because it doesn=t go to any issue here.@ 
Similarly, in his appellate brief, Lundy asserts that Aa finding as to what Mr. Lundy=s compensation from Houston Hand and Global was has no
significance whatsoever with regard to the manner that issue was submitted in
relation to Dr. Masson=s
fraud or breach of fiduciary duty causes of action.@

Masson
presented evidence that Lundy earned a total of $259,615.46 while employed at
Global.  He also testified that he had relied on Lundy=s misrepresentation regarding Byrne=s patent, among others, when he agreed to hire Lundy and
pay him an annual salary of $200,000.  Contrary to Lundy=s assertion, we find that Question No. 8 was properly
submitted as it related to Masson=s
fraud claim and, therefore, was not immaterial.  Issue four is overruled.

d.       Punitive Damages Award

(i)      Sufficiency of the Evidence 

In
issues six and seven, Lundy contends that the evidence is  insufficient to
support the $500,000 in punitive damages awarded to Masson on his fraud claim. 
Lundy argues that the award should be set aside because (1) there is no
evidence to support it, and (2) it is excessive under the circumstances.[14]








To award
exemplary damages,  the jury had to find by clear and convincing evidence that
the harm to Masson resulted from malice or fraud.  See Tex. Civ. Prac. & Rem. Code ' 41.003 (Vernon Supp. 2006).  A finding of intent to harm
or conscious indifference to the rights of others will support an award of
exemplary damages.  Spoljaric, 708 S.W.2d at 436; Trenholm v.
Ratcliff, 646 S.W.2d 927, 933 (Tex. 1983).  For a finding of malice to be
sustained on appeal, legally sufficient evidence must show both that the act was
likely to result in serious harm and that the defendant was consciously
indifferent to the risk of harm.  KPH Consolidation, Inc. v. Romero, 102
S.W.3d  135, 145 (Tex. App.CHouston
[14th Dist.] 2003), aff=d, 166
S.W.3d 212 (Tex. 2005).  Evidence of malice is legally sufficient if,
considered as a whole in the light most favorable to the prevailing party, it
rises to a level that would enable reasonable and fair-minded people to differ
in their conclusions.  Id.

Question
No. 3 of the Jury Charge defines malice as Aa
specific intent by Sean Lundy to cause substantial injury to Marcos Masson; or
an act or omission by Sean Lundy, (i) which when viewed objectively from
the standpoint of Sean Lundy at the time of its occurrence involves an extreme
degree of risk, considering the probability and magnitude of the potential harm
to others; and (ii) of which Sean Lundy has actual, subjective awareness of the
risk involved but nevertheless proceeds with conscious indifference to the
rights, safety, or welfare of others.@[15] 
Question 3 also properly included fraud as a ground for recovery of exemplary
damages and accompanying definitions.  See Comm. on Pattern Jury
Charges, State Bar of Tex., Texas Pattern Jury Charges: Business, Consumer,
Insurance, Employment PJC 110.33 (2006).








Based
on our review of the record, we conclude that there is legally sufficient
evidence that Lundy acted in a manner involving an extreme degree of risk,
namely, by deceiving Masson about the status of Byrne=s patent.  As a shareholder in ORI, Lundy participated in
negotiating the terms of the agreement between Byrne and ORI and approved them
and, thus, was aware that Byrne was legally entitled to request the
reassignment of his patent from ORI.  Byrne=s
testimony that Lundy refused to return his calls after he requested that ORI
reassign the patent to him also supports the argument that Lundy was well aware
of the risk of potential liability to Masson and financial impact to Global=s sales but nevertheless used Byrne=s retractor technology with conscious indifference to the
rights and welfare of Masson.  Further, after reviewing the evidence in the
Byrne litigation, Gerhardt concluded that malfeasance had occurred because Athe intellectual property issues were not disclosed . . .
[t]hey weren=t really fully discussed with
the doctors.@  This was legally sufficient
evidence from which the jury could reasonably infer that Lundy acted with
malice thereby causing injury to Masson.  See Burleson, 27 S.W.3d at 618B19 (finding evidence of malice where bank=s loan officer, who understood relative placement of risk
of loss between parties, failed to explain true nature and terms of
construction loan to plaintiff contractor).

Lundy
also argues that the award of exemplary damages to Masson is excessive under
the circumstances.  The jury awarded Masson actual damages in the amount of
$500,000  based on his fraud claim and awarded him $500,000 in punitive
damages.  In support of his argument, Lundy simply states that  Aan award of twice the amount of actual damages under the
circumstances is not a reasonable relationship [to the actual damage award].@[16]








Assuming
that Lundy is challenging the constitutionality of the jury=s findings of exemplary damages, we review the award de
novo to ensure that exemplary damages are not Agrossly disproportional@ to
the gravity of the defendant=s
conduct.  See Bunton v. Bentley, 153 S.W.3d 50, 54 (Tex. 2004) (citing Cooper
Indus. v. Leatherman Tool Group, Inc., 532 U.S. 424, 434-36 (2001)).  We
consider (1) the degree of reprehensibility of the defendant=s misconduct, (2) the disparity between the actual or
potential harm suffered by the plaintiff and the punitive damages award, and
(3) the difference between the punitive damages awarded by the jury and the
civil penalties awarded or imposed in other comparable cases.  Id.
(citing State Farm Mut. Auto. Ins. v. Campbell, 538 U.S. 408, 418
(2003)).  The most important of these considerations is the degree of
reprehensibility of the defendant=s
misconduct.  State Farm Mut. Auto. Ins. v. Campbell, 538 U.S. 408, 419
(2003).  To determine the degree of reprehensibility, we evaluate whether (1)
the harm was physical or economic, (2) the conduct constituted an indifference
to or reckless disregard of the health or safety of others, (3) the target of
the conduct was financially vulnerable, (4) the conduct was a repeated or
isolated event, and (5) the harm was the result of intentional malice,
trickery, deceit or mere accident.  Id.[17]

First,
we consider the degree of reprehensibility of Lundy=s conduct.  There is no evidence that the harm to Masson
was physical or that the harm showed a reckless disregard or indifference for
Masson=s health or safety or the health or safety of others. 
While Masson was not an overly financially vulnerable  target, he invested
significantly in Global=s
start-up with funds from his surgical practice as well as with personal
resources and personally guaranteed a substantial line of credit.  Further, as
we have already noted, the evidence supports the jury=s finding that Lundy deceived Masson by telling him that
Byrne=s patent was Anot a
problem@ and Awe can
do whatever we want with it.@ 
While these statements were made only once, the deceit arguably continued as
Global began manufacturing and selling its retractor using Byrne=s technology.








We
next consider the disparity between the actual or potential harm suffered by
Masson and the punitive damages award.  The United States Supreme Court has
indicated that awards of exemplary damages that are less than four times the
actual damages are well below the line of constitutional impropriety.  Campbell,
538 U.S. at 425 (concluding that single-digit multipliers are more likely to
comport with due process while still achieving goals of deterrence and
retribution, than awards with ratios in range of 500 to 1).  We note that the
ratio between the actual damages awarded to Masson on his fraud claim and the
award of exemplary damages is a 1 to 1 ratio.  In light of the fact that the
jury could have awarded Masson more than $1 million in exemplary damages, we
find the award of $500,000 to be reasonable.  See Tex. Civ. Prac. & Rem. Code Ann. ' 41.008(b);[18] Springs Window
Fashions Division, Inc. v. Blind Maker, Inc., 184 S.W.3d 840, 891 (Tex.
App.CAustin 2006, pet. granted, judgm=t vacated w.r.m.) (finding award of exemplary damages of
$2,090,000 reasonable where civil practice and remedies code would permit award
of more than $2.5 million).  We conclude that the award of exemplary damages
against Lundy is not unconstitutionally excessive.  Issues six and seven are
overruled.

(ii)      Jury Charge

In
issue eight, Lundy contends the punitive damages question and instructions were
defective.  Specifically, he argues that they were improper because (1) the
question did not provide for a finding regarding the two theories of fraud or
malice, (2) the question gave an improper definition of malice, and (3) the
instruction allowed the jury to consider Lundy=s net
worth despite no evidence of net worth being submitted to the jury.








Lundy
first argues that because Masson=s
fraud claim was based on two factual theories, the punitive damages question
submitted to the jury should have consisted of three separate possibilities:
fraud based on Lundy=s job
interview, fraud based on Byrne=s
patent, and malice.  PJC 110.33Cthe
predicate question and instruction on an award of exemplary damagesCasks ADo you
find by clear and convincing evidence that the harm to [plaintiff] resulted
from [malice or fraud]?@ 
Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury Charges:
Business, Consumer, Insurance, Employment PJC 110.33 (2006).  It then
provides definitions for Aclear
and convincing evidence@ and Amalice@ and
concludes with the following parenthetical: A[and/or
use appropriate definition for Afraud@; see comment below, AFraud as a ground for exemplary damages.@].@  Id. 
Question 3 of the jury charge mirrors PJC 110.33 and asks ADo you find by clear and convincing evidence that the harm
to Marcos Masson resulted from malice or fraud?@  It
then provides definitions for malice and fraud.

In
support of his argument, Lundy cites to Crown Life Insurance Co. v. Casteel,
22 S.W.3d 378 (Tex. 2000) and Harris County v. Smith, 96 S.W.3d 230
(Tex. 2002).  Lundy=s
reliance on these cases is misplaced.  In Casteel, the Texas Supreme
Court held that A[w]hen
a single broad-form liability question erroneously commingles valid and invalid
liability theories and the appellant=s
objection is timely and specific, the error is harmful when it cannot be
determined whether the improperly submitted theories formed the sole basis for
the jury=s finding.@  22
S.W.3d at 389.  In Smith, the Court applied its reasoning in Casteel to
a jury charge which mixed valid and invalid elements of damages in a single
broad-form submission.  96 S.W.3d at 233B34
(holding trial court erred in overruling timely and specific objection to the
charge, which mixed valid and invalid elements of damages in a single
broad-form submission, and that such error was harmful because it prevented
appellate court from determining whether jury based its verdict on improperly
submitted invalid element of damage).  The court opined that submitting
separate questions on theories of liability and elements of damage might avoid
a finding of harmful error if the appellate court finds that one or more, but
not all, theories or elements lack legal or evidentiary support.  See id.
at 235.








Here,
however, Lundy is not complaining that the jury charge contains an invalid
theory of liability or invalid elements of damages.  Rather, he argues that the
jury should have been required to specify the basis for its award of punitive
damages.  Texas law contains no such requirement.  See Texas Dep=t of Human Servs., 802
S.W.2d at 649 (holding trial court is not required to ask jury to specify
ground on which it relied to answer question in jury charge).[19]

Lundy
next contends that the malice definition in Question 3 was improperly expanded
in violation of section 41.001(7) of the Civil Practice and Remedies Code. 
Lundy makes this same assertion in issues six and seven.  Having previously 
addressed this argument and found it to be without merit, we need not do so
again here.

Lundy
also argues that the punitive damages instruction was defective because it
allowed the jury to consider his net worth although no such evidence was
submitted.  A review of the record reveals that Lundy earned $100,000 a year
while at Knowledge, Inc. and Ahad a
deal where over a three-year period I got what amounted to about almost
$300,000 a year in stock options.@  At
Global, he earned $200,000 a year and had a 20% ownership interest in the
company.  At the time of trial, Lundy ran Henry=s solo
practice and earned $200,000.  This constitutes some evidence of Lundy=s net worth that the jury could have considered in answering
the punitive damages question.  Issue eight is overruled.

2.       Global

In
issues fourteen and fifteen, Lundy contends the evidence is legally and
factually insufficient to support the jury=s
finding in favor of Global on the fraud issue.  The jury found that Lundy=s actions damaged Global=s
business operations and awarded Global $100,000 for waste of inventory.








In
support of the fraud finding, Global argues that Lundy failed and refused to
(1) keep Global=s
owners, shareholders, and principals informed of Global=s financial state, (2) disclose that he neglected to
properly store and maintain Global=s
inventory in sterile condition, (3) properly record certain liabilities of
Global thereby manipulating the financial books and records of the company, (4)
correctly represent certain financial projections in Global=s private placement memorandum, (5) disclose that Lundy
unilaterally ceased work at Global and vacated the premises to perform services
at Houston Hand, (6) disclose that Lundy did not have experience in
international outsourcing, (7) properly record and account for a $75,000
promissory note that he owed to Global and then subsequently lied about its
existence, (8) disclose that he did not have any experience managing payroll
functions, (9) disclose that Lundy intended to defraud Byrne by converting his
intellectual property, (10) disclose that he had no experience setting up a
manufacturing process, (11) disclose that ORI had failed, (12) disclose that
his prior job was as a photographer, not a Wall Street professional, as he had
represented to Masson, and (13) disclose that he had been sued by his
father-in-law in a prior business venture.

 The
jury found in favor of Global on its fraud claim.  In Question No. 14, the
charge asked the jury to consider the following elements in awarding damages: A(1) Global=s
investment and cost to develop and market the Magellan Retractor Device. (2)
Money advanced to Sean Lundy to purchase his house.  (3) Damage to Global=s business operations by waste of inventory.@  The jury did not award any damages for the first two
elements and awarded $100,000 in damages for waste of inventory.  Of the
allegations enumerated above, Global=s
contention that Lundy failed to disclose that he had neglected to properly
store and maintain Global=s
inventory in sterile condition appears to be the basis upon which the jury
based its damages award.  However, we do not find that the evidence supports
such a finding.








In
examining the circumstances surrounding this allegation, we note that the
entity concerned here is a corporation.  AA
corporation can act and acquire knowledge only through its agents.@  Poth v. Small, Craig & Werkenthin, L.L.P. 967
S.W.2d 511, 515 (Tex. App.CAustin
1998, pet. denied) (citing Hirsch v. Texas Lawyers= Ins. Exch., 808 S.W.2d 561, 563
(Tex. App.CEl Paso 1991, writ denied)).  AKnowledge held by corporate officers or directors may be
imputed to the corporation itself.@  Id.
(citing Hirsch, 808 S.W.2d at 563).  Burks testified that, in 2003, she
learned from Steritec that Global=s
original contract for sterilization had expired and that Global would have to
complete a sterilization re-validation before Steritec would resume
sterilization of its products.[20]  At that time,
one of Global=s products was in quarantine awaiting
sterilization.  Burks testified that when she told Lundy about the issue, he
would not authorize the re-validation.  Consequently, neither the product in
quarantine nor subsequent products were sterilized.  Thus, as an officer of
Global, Burks was aware that some of Global=s
inventory was not sterilized and, without a re-validation, future products
would not be sterilized.  As such, Lundy cannot be held liable for failing to
disclose a fact the company knew through one of its officers.  See id.
at 515.[21]

We
conclude the evidence is legally and factually insufficient to support a
finding of fraud as to Global.  Issues fourteen and fifteen are sustained.  In
light of our disposition of these issues, issues sixteen through eighteenCrelated to the punitive damages awarded to Global on its
fraud cause of actionCare
moot.

B.      Breach of Fiduciary Duty








The
elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship
between the plaintiff and defendant,  (2) a breach by the defendant of his fiduciary
duty to the plaintiff, and (3) an injury to the plaintiff or benefit to the
defendant as a result of the defendant=s
breach.  See Jones v. Blume, 196 S.W.3d 440, 447 (Tex. App. CDallas 2006, pet. denied); Punts v. Wilson, 137
S.W.3d 889, 891 (Tex. App.CTexarkana
2004, no pet.).  Due to its extraordinary nature, the law does not recognize a
fiduciary relationship lightly.  See Willis v. Donnelly, 199 S.W.3d 262,
278 (Tex. 2006); Hoggett v. Brown, 971 S.W.2d 472, 488 (Tex. App.CHouston [14th Dist.] 1997, pet. denied).  Whether such a
duty exists depends on the circumstances.  Hoggett, 971 S.W.2d at 488.

A
fiduciary relationship may arise from formal and informal relationships and may
be created by contract.  Cotten v. Weatherford Bancshares, Inc., 187
S.W.3d 687, 698 (Tex. App.CFort
Worth 2006, pet. denied).   Fiduciary duties arise as a matter of law in
certain formal relationships, including attorney‑client and trustee
relationships.  Meyer v. Cathey, 167 S.W.3d 327, 330 (Tex. 2005).  In
contrast, an informal fiduciary duty may arise from a moral, social, domestic,
or purely personal relationship of trust and confidence.  Id.; Cotten,
187 S.W.3d at 698.  Such a confidential relationship exists where influence
has been acquired and abused and confidence has been extended and betrayed.  Cotten,
187 S.W.3d at 698.  To impose an informal fiduciary duty, the relationship of
trust and confidence must exist prior to, and apart from, the agreement that is
the basis of the suit.  Id.  The existence of a confidential
relationship is ordinarily a question of fact for the jury.  Id.

1.       Masson

a.       Cause of Action

In
issues nine and ten, Lundy contends the evidence is legally and factually
insufficient to support the breach of fiduciary findings against him in favor of
Masson and Global.  Specifically, Lundy argues that the evidence is
insufficient to show (1) the existence of a fiduciary relationship, (2)
assuming a duty existed, a breach of duty, and (3) a transaction between Lundy
and Masson.

(i)      Duty

Lundy
argues that, absent evidence of a formal relationship, Masson must show that an
informal confidential relationship existed between them.[22] 
He concludes








[h]owever, this is impossible because to impose an informal
fiduciary duty in a business transaction, the special relationship of trust and
confidence must exist prior to, and apart from, the agreement made the basis of
the suit.  In other words, there must be a preexisting special relationship of
trust and confidence which is betrayed in later dealings, and in short, there
is no fiduciary relationship as a matter of law that predates the contract
between the parties.

Although
Lundy frames the issue as a challenge to both the legal and factual sufficiency
of the evidence in his brief, the entirety of his argument, as demonstrated
above, is that there is no evidence of a prior confidential relationship. 
Therefore, we limit our review to determine the legal sufficiency of the
evidence.  See San Antonio Props., L.P. v. PSRA Invs., Inc., __ S.W.3d
__, No. 04-07-00075-CV, 2008 WL 647781, at * 3 (Tex. App.CSan Antonio Mar. 12, 2008, no pet. h.) (noting that
although appellant=s
brief stated issue as legal and factual sufficiency challenge, substance of
argument was one of Ano
evidence@ requiring legal sufficiency review only).








Question
No. 5 of the jury charge asked, ADid a
relationship of trust and confidence exist between Sean Lundy and Marcos
Masson?@  The question instructed the jury that A[a] relationship of trust and confidence existed if Marcos
Masson justifiably placed trust and confidence in Sean Lundy to act in Marcos
Masson=s best interest.  Marcos Masson=s subjective trust and feelings alone do not justify
transforming arm=s-length
dealings into a relationship of trust and confidence.@  However, the question did not include an instruction that
the relationship had to exist prior to, and separate from, the agreement made
the basis of the suit.  A review of the record further reveals that Lundy did
not tender to the trial court an alternative written instruction informing the
jury that a prior and separate relationship is required or otherwise object to
the omission of such an instruction.[23]  As such, he
failed to preserve his argument that there must be evidence of a pre-existing
relationship.  See Tex. R. Civ.
P. 278 (AFailure
to submit a definition or instruction shall not be deemed a ground for reversal
of the judgment unless a substantially correct definition or instruction has
been requested in writing and tendered by the party complaining of the
judgment.@); W. Reserve Life Assur.
Co. v. Graben, 233 S.W.3d 360, 373 (Tex. App.CFort
Worth 2007, no pet.) (holding appellants waived argument that prior and
separate relationship must exist to impose informal relationship where
appellants failed to provide trial court with alternative written instruction
containing such language); Bayer Corp. v. DX Terminals, Ltd., 214 S.W.3d
586, 602B03 (Tex. App.CHouston
[14th Dist.] 2006, pet. denied) (concluding appellant does not preserve issue
of omitted instruction or question for appellate review unless appellant
tenders written request to trial court for submission of question or
instruction in Asubstantially
correct wording@).

Other
than asserting that Athere
is no fiduciary relationship as a matter of law that predates the contract
between the parties,@ Lundy
offers no argument or analysis whatsoever explaining why the evidence of the
parties= relationship and interactions is insufficient to give rise
to an informal fiduciary duty.  Where a party fails to support an issue with argument,
he waives any error on appeal.  Happy Harbor Methodist Home, Inc. v. Cowins,
903 S.W.2d 884, 886 (Tex. App.CHouston
[1st Dist.] 1995, no writ) (A[Appellant]
does not provide us with argument that is sufficient to make its appellate
complaint viable, and we will not perform an independent review of the record
and applicable law to determine whether the error complained of occurred.@); see also Bankhead v. Maddox, 135
S.W.3d 162, 163-64 (Tex. App.CTyler
2004, no pet.) (AIn its
review of a civil matter, an appellate court has no discretion to fabricate an
issue not raised in the appellant=s
brief . . . .@).  Moreover, he cites to no
authority nor directs us to any relevant facts to support a sufficiency
contention.  A party=s
failure to cite any authority to support its contention on appeal itself waives
the contention.  Cowins, 903 S.W.2d at 886.  We are not required to do
the job of the advocate.  Id.  As such, Lundy has waived this issue.








(ii)      Breach

Lundy
next contends that, assuming a fiduciary duty existed, there is no evidence
that he breached his duty to Masson.  Question No. 6, which mirrors PJC 104.2,
instructed the jury that to prove that he complied with his duty, Lundy had to
show: (1) the transactions in question were fair and equitable to Masson, (2)
he made reasonable use of the confidence that Masson placed in him, (3) he
acted in the utmost good faith and exercised the most scrupulous honesty toward
Masson, (4) he placed the interests of Masson before his own, did not use the
advantage of his position to gain any benefit for himself at the expense of
Masson, and did not place himself in any position where his self-interest might
conflict with his obligations as a fiduciary, and (5) he fully and fairly
disclosed all important information to Masson concerning their transactions.

A
review of the record reveals some evidence that Lundy did not make reasonable
use of the confidence that Masson placed in him and that he did not act in the
utmost good faith and exercise the most scrupulous honesty toward Masson. 
Masson testified that Lundy persuaded him to secure a $1 million line of credit
to Agrow the company,@ for
which Masson was later held liable.  Based on Lundy=s recommendation, Masson loaned $450,000 of his own money
to Global, which was never repaid notwithstanding Lundy=s assurances to the contrary.  Masson also testified that
Lundy and Henry transferred approximately $700,000 from Houston Hand to Global
without Masson=s knowledge or approval. 
Moreover, Lundy was dishonest with Masson when he told him that Byrne=s patent was Ano
problem.@  








The
testimony of Masson, Reicheck, and Burks demonstrate that Lundy failed to fully
and fairly disclose important information to Masson.  Masson testified that
Lundy routinely failed to provide him with the company=s financial information or access to financial records,
despite Masson=s requests.  On
cross-examination, Lundy admitted that he did not regularly provide Masson with
written operating or sales reports.  Reicheck, Global=s controller, also testified that Lundy forbade her from
providing Masson with any financial information, and that if she continued to
do so, she would lose her job.  Burks also testified that when she told Lundy
that Masson had asked her for financial information, Lundy replied that Masson
should ask him, not her, for the information.  Burks further testified that
Masson had told her that when he had asked Lundy to provide him with financial
information on several occasions, Lundy was not forthcoming.[24]

Lundy
also contends that because the jury charge does not refer to any particular
transaction in which he supposedly breached his duty to Masson, Masson=s breach of duty claim fails.  Lundy cites no authority to
support his argument, nor are we are of any.  As such, he has waived this
argument.  See Cowins, 903 S.W.2d at 886.

Anything
more than scintilla of evidence is legally sufficient to support the jury=s finding that Lundy breached his fiduciary duty to
Masson.  See Cont=l
Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex.
1996); W. Reserve Life Assur. Co., 233 S.W.3d at 375.  We find that the
foregoing constitutes more than a scintilla of evidence that Lundy breached his
duty to Masson.  Further, we conclude that the jury=s finding is not so contrary to the overwhelming weight of
the evidence as to be clearly wrong and unjust.  We therefore hold that the
evidence was legally and factually sufficient to support the jury=s verdict.  Issues nine and ten are overruled.

b.       Jury Charge

In
issues eleven and twelve, Lundy contends that the breach of fiduciary duty
submission in the jury charge was defective as to Masson on two grounds. 
First, the burden to prove a breach of fiduciary duty was improperly placed on
Lundy.  Second, the charge gave no guidance to the jury as to which transaction
he supposedly breached his duty.








Lundy
argues that Masson had the burden to prove that Lundy breached his fiduciary
duty to him, and that Question No. 6 improperly placed the burden on Lundy to
prove he complied with his duty.[25]  This argument is
misplaced.  Texas courts apply a rebuttable presumption of unfairness to
transactions between a fiduciary and a party to whom he owes a duty of
disclosure.  Lee v. Hasson, No. 14-05-00004-CV, ___ S.W.3d ___, 2007 WL
236899, at *15 (Tex. App.CHouston
[14th Dist.] Jan. 30, 2007, pet. denied); Collins v. Smith, 53
S.W.3d 832, 840 (Tex. App.CHouston
[1st Dist.]  2001, no pet.).  Thus, the profiting fiduciary bears the burden of
showing the fairness of the transactions.  See Tex. Bank & Trust Co. v.
Moore, 595 S.W.2d 502, 508B09
(Tex. 1980); Lee, 2007 WL 236899, at *15; Collins, 53 S.W.3d at
840.  The trial court did not misplace the burden of proof.[26] 
Issue eleven is overrruled.

Lundy
also argues that the breach of fiduciary duty submission was defective because
it gave no guidance to the jury as to which transaction he supposedly breached
his duty.  Because we previously found that Lundy waived this argument, we need
not address it again here.  Issue twelve is overruled.








c.       Election of Remedies

In
issue thirteen, Lundy asserts that Masson should have been required to elect
between damages awarded on his fraud and breach of fiduciary duty causes of
action.  He argues that because the facts asserted to prove fraud are the same
facts asserted to prove breach of fiduciary duty, the trial court should have
required Masson to elect between the damages and erred in entering judgment on
both awards.

The
single recovery, or one satisfaction rule, is a rule of general acceptance that
an injured party is entitled to one satisfaction for sustained injuries.  See
Stewart Title Guar. Co. v. Sterling, 822 S.W.2d 1, 7 (Tex. 1991).  If a
plaintiff pleads alternate theories of liability, a judgment awarding damages
on each alternate theory may be upheld if the theories depend on separate and
distinct injuries and if separate and distinct damages findings are made as to
each theory.  See Birchfield v. Texarkana Mem=l Hosp., 747 S.W.2d 361, 367 (Tex.
1987). However, a party who seeks redress under two or more theories of recovery
for a single wrong must elect, before the judgment is rendered, under which
remedy he wishes the court to enter a judgment.  Star Houston, Inc. v.
Shevack, 886 S.W.2d 414, 422 (Tex. App.CHouston
[1st Dist.] 1994), writ denied per curiam, 907 S.W.2d 452 (Tex. 1995); American
Baler Co. v. SRS Sys., Inc., 748 S.W.2d 243, 246 (Tex. App.CHouston [1st Dist.] 1988, writ denied).  But where the
prevailing party fails to make that election, the trial court should use the
findings affording the greater recovery and render
judgment accordingly.  Birchfield, 747 S.W.2d at 367.  If the trial
court fails to do so, the appellate court will reform the trial court=s judgment to effect such an election.  Star Houston,
886 S.W.2d at 423; American Baler Co., 748 S.W.2d at 246, 250.

A
review of the record reveals that Masson did not attempt to distinguish between
the damages he suffered as a result of Lundy=s
fraud and breach of fiduciary duty.  Rather, he presented evidence of his
damages generally, focusing in particular on his $450,000 loan to Global, the
$1 million line of credit which he personally guaranteed and for which he was
later sued, and Houston Hand=s
numerous cash loans to Global totaling over $670,000.








Further,
Masson submitted identical damage questions after both liability questions in
the jury charge.  The jury was instructed to consider the following elements of
damages for fraud and breach of fiduciary duty: (1) Masson=s out-of-pocket loans to Global and (2) damage to Masson=s credit reputation sustained in the past, and in
reasonable probability, he will sustain in the future as a result of his
guarantee of the Bank of America loan.  See Madison v. Williamson, 241
S.W.3d 145, 159 (Tex. App.CHouston
[1st Dist.] 2007, pet. denied) (holding trial court properly concluded
plaintiff=s claims resulted in single,
indivisible injury where plaintiff did not attempt to distinguish between
damages suffered and submitted identical damage questions after each liability
question in jury charge); Household Credit Svcs., Inc. v. Driscol,  989
S.W.2d 72, 80 (Tex. App.CEl
Paso 1998, pet. denied).  Moreover, the fact that the jury awarded different
amounts under the two theories does not preclude application of the doctrine. 
The one satisfaction rule may limit a plaintiff=s recovery
even where the amounts awarded vary from claim to claim.  See Driscol,
989 S.W.2d at 80.

We
also find that Masson=s
fraud and breach of fiduciary duty claims are based on the same acts or
omissions.  Throughout the record and in appellees= brief, Masson refers to the same acts and omissions by
Lundy as evidence that Lundy committed fraud and breach of fiduciary duty.  See
Spethmann v. Anderson, 171 S.W.3d 680, 694 (Tex. App.CDallas 2005, no pet.) (concluding trial court should have
required plaintiff to elect between awards of damages against defendant for
fraud and breach of fiduciary duty where formula for calculating damages was
same for both theories and both involved same conduct).  Moreover, in closing
arguments, Masson=s
counsel stated, AYou=re asked two different questions, one about fraud, one
about breach of fiduciary duty.  There are just two different theories of
liability.  The same evidence really generally supports both, and you B they aren=t
dependent on each other.@
(emphasis added).








Accordingly,
we sustain issue thirteen and find that Masson may recover on only one of his
theories of recovery.  When, as in this case, the plaintiff establishes
separate theories of liability based on the same facts and fails to elect
between more than one recovery, the appellate court should render judgment on
the finding affording the greatest recovery.  See Star Houston, 886
S.W.2d at 423; Murphy v. Seabarge, Ltd., 868 S.W.2d 929, 938 (Tex. App.CHouston [14th Dist.] 1994, writ denied).  We hold that the
trial court should have applied the election of remedies rule and limited Masson=s recovery to the damages awarded for his fraud claim
because the fraud award afforded the greatest recovery.  Issue thirteen is
sustained.

2.       Global

a.       Cause of Action

In issues
nineteen and twenty, Lundy contends that the evidence is legally and factually
insufficient to support the jury=s
verdict in favor of Global on its breach of fiduciary duty claim. 

(i)      Duty

In his
Supplemental Brief, Lundy contends that we must determine what duties, if any,
a non-managing member owes to a managing member or to the LLC itself.[27] 
In support of his contention, Lundy asserts that A[p]art
of the appellant=s
complaint in this appeal is that the jury was instructed that the appellant in
fact had a fiduciary duty.@  He
then directs us to the arguments raised in his Original Brief under issues
eleven, twelve, twenty-one, and twenty-two, which address the jury submissions
on the breach of fiduciary duty claims.  However, a close examination of these
arguments reveals that they focus solely on whether (1) there was evidence of a
breach, not a duty, (2) appellees were required to identify the
particular transaction at issue, and (3) the burden of proof on the breach of
fiduciary duty claims was improperly shifted to Lundy.  In short, Lundy appears
to argue, for the first time in this appeal, that the trial court erred in
instructing the jury that appellant had a fiduciary duty to Global as a matter
of law rather than submitting a jury question.

To argue on appeal that the trial court erred in
instructing the jury that a fiduciary duty 








existed
because it is a fact question, an appellant has to have objected to the charge
on that ground, or at least in a manner sufficient to alert the trial court that
the existence of a fiduciary relationship was a fact question for the jury.  See
State Dep=t of
Highways & Pub. Transp. v. Payne, 838 S.W.2d 235, 241 (Tex.
1992) (concluding test is whether party made trial court aware of complaint,
timely and plainly, and obtained ruling).  Lundy=s
counsel objected to Question No. 9CADid Sean Lundy comply with his fiduciary duty to Global?@Cas follows: ARegarding Question No. 9, there is no evidence to B the only way that you can have a breach of fiduciary duty
with respect to a corporation is to allege a breach of a duty of obedience, a
breach of a duty of loyalty, or a breach of duty of care. Global has never
specified which of these duties it=s
talking about in its pleadings, nor in its evidence introduced at trial. They
didn=t introduce any evidence of the breach of fiduciary
duty . . . .@ (emphasis added).  His
counsel=s objection is aimed solely at the question of a breach,
not a duty.  It is also worth noting that in his objection to Question No. 5BADid a relationship of trust
and confidence exist between Lundy and Masson?@BLundy=s
counsel argued that Athe
only evidence that was introduced in the record regarding any fiduciary duty
was Sean Lundy B Sean
Lundy=s fiduciary duty to the
corporation. There was no evidence at all of a fiduciary
duty from Sean Lundy running to Dr. Masson@
(emphasis added).  Thus, not only did Lundy not object to the trial court=s instruction that Lundy owed a fiduciary duty to Global,
he also acknowledged that there was some evidence presented that Lundy owed a
duty to Global.  See Hazlewood Patterson Co. v. Hancock, No. 10-03B00274-CV, 2004 WL 2903861, at *5 (Tex. App.CWaco Dec. 15, 2004, pet. denied) (mem. op.) (holding issue
whether trial court=s
instruction that defendants owed plaintiffs fiduciary duty was error was not
preserved for appeal where defendants objected only on no evidence ground
rather than objecting to instruction itself).[28]  As such, Lundy
failed to preserve error on this ground.








(ii)      Breach

In his
Original Brief, Lundy claims that Global=s
claim was based solely on a breach of the duty of loyalty and the evidence is
insufficient to support a finding of a breach of that duty.  He also argues
that the jury=s finding of a breach fails
because Global did not specify the transaction or corporate opportunity Lundy
allegedly usurped.

Question
No. 6 of the charge instructed the jury as follows:

As an officer of
Global, Sean Lundy owed the company a fiduciary duty.  To  prove he complied
with his duty, Sean Lundy must show:

a. the transactions in question were fair and
equitable to Global;

b. Sean Lundy made
reasonable use of the confidence that Global placed in him;

c. Sean Lundy acted in
the utmost good faith and exercised the most scrupulous honesty toward Global;

d. Sean Lundy placed
the interests of Global before his own, did not use the advantage of his
position to gain any benefit for himself at the expense of Global, and did not
place himself in any position where his self-interest might conflict with his
obligations as a fiduciary; and

e. Sean Lundy fully and
fairly disclosed all important information to Global concerning the
transactions.








A review of the record reveals ample evidence to support the jury=s findings that Lundy breached his duties to Global. 
Gerhardt testified that Global could no longer be run due to the problems
caused by Lundy=s
malfeasance.  Global=s main
initial product that it manufactured, marketed, and sold was based on retractor
technology that belonged to Byrne.  Byrne later sued Global, along with Masson,
for among other things, conversion, arising from Global=s use of Byrne=s
patent technology.  The evidence shows that Lundy manipulated the company=s books by not properly recording certain liabilities which
adversely affected decision-making at the company.  Gerhardt also testified
that certain financial projections in the private placement memorandum prepared
by Lundy and issued to outside investors were Agrossly
misleading.@  In late 2002, Lundy ceased
working at Global for approximately ten months to Aclean the books@ that
were supposedly left in a mess by Reicheck.  Gerhardt testified that once Lundy
left Global, A[t]he sales really dropped. 
There were no sales.@  In
May 2003, Lundy executed a full-time employment agreement with Houston Hand although
he was supposed to be working full-time as Global=s
President and CEO.  Lundy failed to properly record and account for the $75,000
promissory note he owed to Global.  There was also evidence that he failed to
keep Global=s owners and officers informed
of Global=s financial condition.








In support of his argument that the evidence is insufficient to
support a finding that he breached his duty to Global, Lundy contends that the
jury charge does not identify which transaction he supposedly took advantage
of.  He then states that A[t]he
breach stated in Global=s
pleadings, even if supported by the evidence, is not, as a matter of law, an
adequate basis to sustain a breach of loyalty finding.  This is because, as
alleged in Global=s
pleadings, >cooking the books,= and >false
private placement,= even
if true, was, according to Global=s
pleadings, intended to help, not hurt Global.@  This
argument is without merit.  Lundy cites no authority to support his argument
that the charge submission must isolate a particular transaction, nor are we
aware of any.[29]  As such, this
argument is waived.  Moreover, we find nothing in the record to support Lundy=s assertion that Global considered his falsifying of its
financial records and inaccurate private placement memorandum as an attempt Ato help, not hurt@
Global.[30]

We conclude that there is more than a scintilla of evidence to
support the jury=s
finding that Lundy breached his fiduciary duty to Global.  We also conclude
that the jury=s finding is not so contrary
to the overwhelming weight of the evidence as to be clearly wrong and unjust. 
Accordingly, we hold that the evidence is legally and factually sufficient to
support the jury=s
verdict.  We overrule issues nineteen and twenty.

b.       Jury
Charge

In issue twenty-one, Lundy contends that the form of Global=s breach of fiduciary claim was defective because it should
have identified the particular transaction in question, and then required the
jury to determine whether the transaction was fair.  As previously discussed,
Lundy waived this argument and, therefore, we do not address it again here. 
Issue twenty-one is overruled. 

In issue twenty-two, Lundy contends that the jury charge form of
Global=s breach of fiduciary claim improperly shifted the burden
of proof to Lundy.  However, as discussed above, a rebuttable presumption of
unfairness is applied to transactions between a fiduciary and a party to whom
he owes a duty of disclosure.  Lee, 2007 WL 236899, at *15; Collins,
53 S.W.3d at 840.  Thus, the profiting fiduciary has the burden of
demonstrating the fairness of the transactions.  See Tex. Bank & Trust
Co., 595 S.W.2d at 508B09; Lee,
2007 WL 236899, at *15.[31]  We overrule
issue twenty-two.








c.       Election of Remedies

In issue twenty-three, Lundy asserts that Global should have been
required to elect between the damages awarded for its fraud and breach of
fiduciary duty causes of action because the same facts underlie both theories. 
Because we held above that there is insufficient evidence to support the fraud
finding in favor of Global, there is no election to be made.  Issue
twenty-three is overruled.

IV. CONCLUSION

We affirm the trial court=s
judgment in favor of Masson on his fraud and breach of fiduciary duty claims. 
However, we apply the election of remedies rule and reform the judgment to
reflect that Masson=s
recovery is limited to the damages awarded for his fraud claim and affirm the
judgment as reformed.  We affirm the trial court=s
judgment in favor of Global on its breach of fiduciary duty claim.  We reverse
and render that portion of the judgment in favor of Global on its fraud claim.

 

 

/s/      Leslie B. Yates

Justice

 

Judgment
rendered and Opinion filed April 29, 2008.

Panel consists of Justices Yates, Fowler, and
Guzman.









[1]  At the time that Griggs was a partner, Houston Hand
was known as Houston Hand and Microsurgical Center.  The practice ceased its
operations in the summer of 2003.





[2]  During this time, Lundy and his family lived in
North Carolina.  Lundy=s father-in-law, who had provided most of the funding
for ORI, sued Lundy for fraud stemming from the loan.





[3]  An L.L.C. is composed of members as opposed to
shareholders, as in a corporation.  See Tex. Bus. Org. Code Ann. '
101.101 (Vernon Supp. 2005); T.R.Q. Captain=s Landing L.P. v. Galveston Cent. Appraisal Dist., 212 S.W.3d 726, 741 n.3 (Tex. App.CHouston [1st Dist.] 2006, pet. granted).  Section
6.02C of Global=s Regulations provides that the manager may delegate
authority and duties to other managers, as well as assign titles, including the
title of President.





[4]  Henry signed the employment agreement on behalf of
Houston Hand in his capacity as Managing Partner but never informed Masson of
the agreement.  Exhibit A to the agreement reflects Lundy=s duties and responsibilities at Houston Hand and
lists among them, APerform duties as the President of Global Orthopedic
Solutions.@





[5]  Bank of America subsequently sued Masson and Henry
based upon their personal guarantees.





[6]  Masson voluntarily non-suited his conversion claim
at the conclusion of plaintiffs= case-in-chief.





[7]  The other causes of action for conversion and theft
were subsequently dismissed.





[8]  Byrne filed suit against Global, Masson, Henry,
Lundy, and John Egbert, Global=s patent
attorney, alleging claims of negligence, gross negligence, theft of trade secrets,
conversion, breach of fiduciary duties, and conspiracy.  On March 30, 2005,
Byrne, Global, and Masson settled the claims against Global and Masson.





[9]  In its final judgment, the trial court reduced the
punitive damages award to Global to $100,000.





[10]  In their brief, appellees object that appellant=s brief exceeds the fifty page limit set forth in
Texas Rule of Appellate Procedure 38.4.  However, because appellant filed a
motion for leave to extend the page limit, which we subsequently granted, the brief
is not in violation of Rule 38.4.

 





[11]  Rule 295 states, in relevant part, AIf [the purported verdict] is
incomplete, or not responsive to the questions contained in the court=s charge, or the answers to the
questions are in conflict, the court shall in writing instruct the jury in open
court of the nature of the incompleteness, unresponsiveness, or conflict,
provide the jury such additional instructions as may be proper, and retire the
jury for further deliberations.@





[12]  Lundy=s
employment records, which were admitted as an exhibit, reflect that his gross
pay from January 2002 to August 2003 totaled $259,615.46.





[13]  While it is arguable whether the jury=s answer to Question No. 8 constitutes an incomplete
or unresponsive verdict, or conflicting jury findings, as contemplated by Texas
Rule of Civil Procedure 295, the rationale requiring an objection before the
jury is dischargedCi.e., to
permit the trial court to prevent or correct the errorCapplies equally here.





[14]  In his AStatement
of Issues,@ Lundy frames issues six and seven as challenges to
the legal and factual sufficiency of the evidence supporting the punitive
damage award.  However, in his brief, he argues only that there is no evidence,
i.e. legally insufficient evidence, and offers no argument challenging
the factual sufficiency.  Thus, we treat his evidentiary challenge as one to
the legal sufficiency only.





[15]  Lundy contends that the second definition of malice in Question No. 3
was improper and not authorized by statute.  His argument is without merit. 
Question No. 3 is based on PJC 110.33 which is the predicate question and
instructions on an award of exemplary damages.  PJC 110.33 is divided into
parts A and B.  PJC 110.33A, which includes the two definitions of malice as
they appear in Question No. 3, applies to causes of action filed before
September 1, 2003.  PJC 110.33B, which consists solely of the first definition
of malice, applies to actions filed on or after September 1, 2003.  See Pattern
Jury Charges, State Bar of Tex., Texas Pattern Jury Charges: Business,
Consumer, Insurance, Employment PJC 110.33 (2006).  Masson filed his
lawsuit on August 13, 2003, and, therefore, the definition of malice in
Question No. 3 was proper.  See
Dillard Dep=t Stores, Inc. v. Silva, 148 S.W.3d 370, 373 (Tex. 2004) (per curiam)
(applying two-part statutory definition of malice to case tried prior to 2003
amendment); see also Tex. Prac.
& Civ. Rem. Code Ann. ' 41.001(11) (recodification of subpart (B) of malice
definition as definition of Agross
negligence@).





[16]  Contrary to Lundy=s assertion, the jury=s award of $500,000 in punitive
damages to Masson is equal to the amount of actual damages awarded to Masson on
his fraud claim.





[17]  We note that the factors enunciated in Alamo
National Bank v. Kraus, which provide the framework for a factual
sufficiency review of exemplary damages, are considerations encompassed within
these principles.  616 S.W.2d 908 (Tex. 1981); see Huynh v. Phung, No.
01-04-00267, 2007 WL 495023, at *10 n.8 (Tex. App.CHouston [1st Dist.] Feb. 16, 2007, no pet.) (mem. op.)
(citing Kraus factors).





[18]  Subsection (b) provides as follows: 

 

(b) Exemplary damages awarded against a defendant may
not exceed an amount equal to the greater of:

 

(1)(A) two times the amount of economic damages;  plus

 

    (B) an amount equal to any noneconomic damages
found by the jury, not to exceed $750,000; or

 

(2) $200,000.

 

 Tex. Civ.
Prac. & Rem. Code Ann. ' 41.008(b).

 

 





[19]  We also note that Lundy did not object to the charge
on this basis and, in not doing so, failed to preserve error.  See Tex. R. App. P. 33.1.





[20]  Steritec was the company Global contracted with for
sterilization of its products.





[21]  Because the jury awarded damages solely for waste of inventory and
found no other loss to Global, the remaining allegations do not support the
jury=s finding.

 





[22]  We agree, and appellees do not dispute, that there
is no evidence of a formal relationship between Lundy and Masson. 





[23]  Lundy=s objection to the question on
fiduciary duty was as follows:

            Counsel: Regarding Question No. 5,
the only evidence that was introduced in the record regarding any fiduciary
duty was Sean Lundy - - Sean Lundy=s fiduciary duty to the corporation.  There was no evidence
at all of a fiduciary duty from Sean Lundy running to Dr. Masson.  Therefore,
that instruction should not be given.  No other objection to Question 5.

Court: Objection is overruled. 





[24]  Lundy begins this section by stating, A[a]ssuming the establishment of a fiduciary duty is
overcome, Dr. Masson cites to no facts whatsoever that he [Lundy] breached his
duty to Dr. Masson.@  However, Lundy points to no relevant facts to
support his position.  Instead, he appears only to re-urge his argument that he
did not owe a duty to Masson.  See Cowins, 903 S.W.2d at 886.





[25]  Question No. 6 instructed the jury as follows:

 

Did Sean Lundy comply
with his fiduciary duty to Marcos Masson?  

 

To prove he complied
with his duty, Sean Lundy must show:

 

1. the transactions in question
were fair and equitable to Marcos Masson;

 

2. Sean Lundy made
reasonable use of the confidence that Marcos Masson placed in him;

 

3. Sean Lundy acted in
the utmost good faith and exercised the most scrupulous honesty toward Marcos
Masson;

 

4. Sean Lundy placed the
interests of Masson before his own, did not use the advantage of his position
to gain any benefit for himself at the expense of Masson,

and did not place
himself in any position where his self-interest might conflict with his
obligations as a fiduciary; and

 

5. Sean Lundy fully and
fairly disclosed all important information to Marcos Masson  concerning the
transactions.

 





[26]  We note that Lundy does not contend that he rebutted
the presumption and, therefore, we need not consider this argument.





[27]  Formed in July 2001 as a limited liability corporation,
Global was converted to a corporation in May 2003.





[28]  In Willis v. Donnelly, 118 S.W.3d 10 (Tex. App.CHouston [14th Dist.] 2003), aff=d in part, 199 S.W.3d 262 (Tex. 2006), the
Willises argued that the trial court erred in instructing the jury that a
fiduciary relationship existed, objecting as follows: APlaintiffs would object to Question
No. 22 in that there is no evidence to support submission of the issue . . .
[and] because as a matter of law, Mike Willis owes no fiduciary duty to
Dan Donnelly@ (emphasis added).  Id. at
33.  We concluded that appellants= objections were insufficient to alert the trial court that
existence of a fiduciary relationship was a fact question for the jury.  Id.
at 34.  We held that, to preserve error, the Willises were required to
object that the question was omitted.  Id.  On review, however, the
Texas Supreme Court concluded that the Willises had preserved error based on
their objections that the breach of fiduciary claim should fail as a matter of
law because there was no evidence of a shareholder relationship or any other
legally recognized basis for such a duty and because Willis was never a
shareholder.  Willis v. Donnelly, 199 S.W.3d 262, 276 n.28 (Tex. 2006). 
The present case is factually distinguishable because Lundy objected to
Question No. 9 solely on the basis that there was no evidence of a breach, not
a duty, and conceded that there was evidence introduced of a fiduciary duty
owed by Lundy to Global in his objections to Question No. 5.  Moreover, whether a fiduciary duty exists is a
question of law.  Meyer, 167 S.W.3d at 330.





[29]  In addition to the absence of authority supporting such a proposition,
we note that PJC 104.2 refers to Athe transaction(s),@ without suggesting a preliminary question identifying the particular
transaction.  See Pattern Jury Charges, State Bar of Tex., Texas
Pattern Jury Charges: Business, Consumer, Insurance, Employment PJC 104.2
(2006).





[30]  In its First Amended Cross-Claims, Global alleged
that ALundy had effectively cooked the books so as to
inaccurately reflect the financial condition of the company@ and Amade false
representations and used false data to produce private placement offering
memorandums which he was using to obtain other investors to make loans and
advances.@  These allegations can hardly be characterized as an
acknowledgment by Global that Lundy=s
actions were well-intentioned.





[31]  Lundy does not contend that he rebutted the
presumption.  Thus, we do not consider that argument here.